## UNITED STATES FIRE INSURANCE COMPANY, Plaintiff,

v.

**UNITED LIMOUSINE SERVICE, INC., Pierson & Smith, Inc., Holyland Travel Brokerage Corp., Abdul Ziad, Kemial Kastrat, Douglas David d/b/a Douglas David Insurance, Douglas David Insurance, MISV Car Service Corp., D.E.F. Limo, Corp., Jenny and S Corp., Z & Z Executive Transportation, Inc., Triple a Transportation, Inc., MLM Limousine, Inc., R & R Executive Co., Inc., RMP Limo Co., Inc., ABC Executive Cars, Corp., N.Y. Luxury Transportation, Corp., Luis Madrigal, Luis Madrigal, Inc., Brian Egan, C & M Transportation, Carlos Alvarez and Mohammad Aldeb, Defendants.**

No. 01 CIV. 10821(CM)(LMS)

United States District Court, S.D. New York.

Feb. 6, 2004.

Kevin P. Carroll, D'Amato & Lynch, New York, NY, for United States Fire Insurance Company, Plaintiff.

Thomas M. Cassone, Bello, Lapine & Cassone, Stamford, CT, for Brian Egan, Defendant.

Michael A. Cerussi, Jr., Cerussi & Spring, White Plains, NY, for Pierson & Smith, Inc., Defendant.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

MCMAHON, J.

Plaintiff, United Fire Insurance Co. ("US Fire") brings an action alleging, among many other things, a widespread insurance fraud perpetrated upon Plaintiff by Defendants United States Limousine Service, Inc. ("ULS") and Kemial Kastrat ("Kastrat"), Pierson & Smith, Inc. ("P & S"), Holyland Travel Brokerage Corp. ("Holyland") and Abdul Ziad ("Ziad"), Douglas David d/b/a Douglas David Insurance ("David"), Douglas David Insurance ("DDI"), MISV Car Service Corp.

("MISV"), D.E.F. Limo, Corp.("D.E.F."), Jenny and S Corp. ("Jenny"), Z & Z Executive Transportation, Inc. ("Z & Z"), Triple A Transportation, Inc. ("Triple A"), MLM Limousine, Inc. ("MLM"), R & R Executive Co., Inc. ("R & R"), RMP Limo Co., Inc. ("RMP"), ABC Executive Cars, Corp. ("ABC"), N.Y. Luxury Transportation Corp. ("NY Luxury"), Luis Madrigal ("Madrigal"), Luis Madrigal Inc. ("LM"), Brian Egan ("Egan"), C & M Transportation ("C & M"), Carlos Alvarez ("Alvarez") and Mohammad Aldeb ("Aldeb") in violation of the RICO statute, 18 U.S.C. § 1962.

Plaintiff filed a Complaint with this Court on November 30, 2001, and an Amended Complaint on April 15, 2002.

Defendants Holyland and Ziad, P & S, and Egan (collectively, the "Moving Defendants") have filed three separate motions to dismiss the RICO claims pursuant to Fed.R.Civ.P. 12(b)(6), asserting that Plaintiff has failed to state a claim on which relief can be granted. No other named Defendant has sought dismissal.[1] In addition, Moving Defendants have filed a motion for sanctions under Fed.R.Civ.P. 11.

For the reasons stated below, the motion is granted as to claims asserted pursuant to §§ 1962(a) and (b), and is otherwise denied. Moving Defendants' motion for sanctions is denied.

## BACKGROUND

The following facts are taken from the Amended Complaint dated March 25, 2002 and subsequent Rico Case Statement, dated April 15, 2002, unless otherwise noted.

United States Fire Insurance Co. is an insurance company incorporated in New York, with its principal place of business in Morristown, New Jersey. US Fire is licensed to write various lines of insurance

---

1. Indeed, Defendant United Limousine Services, the insurance policy holder, has not appeared in this action. Nor have many of the other Defendants appeared.

in the State of New York, among them commercial vehicle policy insurance.

Defendant Pierson & Smith is a licensed Connecticut insurance broker and agent that submitted insurance risks to U.S. Fire for underwriting, quotation and binding, pursuant to a written agency agreement dated as of June 1989. P & S has its principal place of business in Norwalk, Connecticut. Defendant Brian Egan is alleged to be "an officer and employee" of P & S.

Pursuant to an agency agreement with U.S. Fire, P & S was authorized to issue and countersign endorsements on contracts of insurance that would increase or extend U.S. Fire's liability or extend the term of any insurance contract, but only after receiving written approval from U.S. Fire.

Defendant Kemial Kastrat is the president of Defendant United Limousine Service, a commercial livery cab (commonly referred to as a "black car") company. In correspondence dated January 21, 1999 (the "January 21, 1999 Letter"), P & S allegedly represented to U.S. Fire that it had "black car" vehicles that were good risks for insurance coverage by U.S. Fire. P & S's letter stated that it "targeted" businesses of "limousine operators that focus on corporate work. We've always screened our opportunities by finding out what type of work is performed ... Our goal [P & S said] is to insure well-run businesses that specialize in corporate accounts." Following this letter, P & S represented to U.S. Fire that ULS was a corporate limousine service that did mostly corporate office or corporate airport work.

Plaintiff claims to have relied on these and other representations by P & S in issuing a commercial vehicle policy to ULS, beginning February 1, 1999 and running through February 1, 2000. The policy covered one vehicle that ULS and P & S represented to plaintiff to be owned by ULS and garaged in Shrub Oak, a rural hamlet in Northern Westchester County.

Plaintiff alleges that P & S continued to communicate with U.S. Fire regarding the nature of its "black car" business. In a March 1999 written communication (the "March 1999 Communication"), P & S stated that it "always avoided, and will continue to avoid the limousine that's parked curbside waiting for a call ... We don't think there are enough controls in place and it's much more like a taxi ..." P & S further represented that its "procedure" included "prescreening," which involved verifying that the insured did corporate work and evaluating management.

By its terms, additional vehicles could be added to the policy so long as they were owned or controlled by ULS and garaged in Westchester. During the first year, 1999–2000, P & S, on behalf of ULS, faxed to U.S. Fire approximately 25 separate commercial policy change request forms. Plaintiff accepted the changes and added approximately 24 vehicles to the policy.

The policy was renewed for successive one-year terms in 2000 and again in 2001. During those two years, P & S, acting on behalf of ULS, faxed over 100 separate commercial policy change request forms to U.S. Fire in order to add these vehicles to the policy. Again, Plaintiff accepted the changes. In the policy's second year, 2000–2001, the total number of vehicles covered increased to 114. By the end of the policy's last year, the total had increased to over 450 vehicles, including vehicles owned by other Defendants.

Plaintiff claims that the policy change requests were accepted, and the policy renewed in 2000 and 2001 based on ULS and P & S's specific representations, made via wire, mail and over the telephone, that the vehicles were owned and controlled by

ULS, garaged in Westchester County and that vehicle operations were pre-screened by P & S. For example, on July 17, 2001, P & S sent a facsimile (the "July 17, 2001 Fax") to U.S. Fire representing that ULS or Kastrat had acquired ownership or control over vehicles owned by the Defendants MISV, D.E.F., Jenny, Z & Z, Triple A, MLM, R & R, RMP, ABC and N.Y. Luxury (collectively the "Livery Defendants") as a result of ULS's taking ownership or control over those corporations. On the same day, P & S presented U.S. Fire with copies of the minutes from the board of directors meetings for some or all of those corporations. On July 20, 2001, P & S faxed a document (the "July 20, 2001 Fax") to U.S. Fire stating that Defendant Kastrat had purchased Defendant C & M.

Plaintiff claims that it later discovered that the vehicles were not in fact owned or controlled by ULS or Kastrat, were not being used exclusively with corporate accounts, were not garaged in Westchester County and did not have owners pre-screened by P & S.

In addition, Plaintiff alleges that Defendants P & S and Holyland, among others, submitted to Plaintiff false and fraudulent Vehicle Identification Numbers ("VIN") for cars that were being insured, and otherwise submitted VIN's that did not match the particular cars that were to be insured.

In its RICO Case Statement, Plaintiff next asserts that P & S, U.S. Fire, and DDI, with the aid of ULS,[2] issued false and fraudulent documents purporting to be U.S. Fire insurance to other livery drivers without the knowledge, consent or acquies-

cence of U.S. Fire, charged those livery drivers excessive premiums and retained the excess over the amount Plaintiff would have charged for the insurance had it been legitimately issued. Those funds were also allegedly used in establishing, operating and maintaining the enterprise.

Finally, Plaintiff alleges that Defendants P & S, Holyland and DDI, with the aid of ULS, charged the Livery Defendants and others who were the actual owners of vehicles which became "insured" under the policy, additional amounts which went beyond the premium charge included in U.S. Fire's policy. The Defendants allegedly kept these funds and used them to invest in their enterprise and to further its goals.

Plaintiff claims to have discovered the scheme while conducting an investigation of the ULS policy. As a result of the discovery, Plaintiff sent a notice of cancellation of the policy to ULS and P & S, effective December 3, 2001.

### THE COMPLAINT

Plaintiff's Amended Complaint asserts ten causes of action under federal and state law. Relevant to this motion are the first four, which allege violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962, *et seq.*—specifically subsections (a), (b), (c) and (d) of § 1962. The RICO claims are the only federal claims alleged in the Amended Complaint and therefore are the sole basis for federal jurisdiction in this action.

---

2. Plaintiff's Amended Complaint alleges that C & M and LM, in addition to P & S, Holyland, DDI and ULS, engaged in the fraudulent insurance sales and excessive premium charges. Plaintiff offers no explanation for this discrepancy. However, Plaintiff does indicate that subsequent to the commencement of this suit, it began "its own investigation of the facts." (Plaintiff Mem. of Law in Opposition to the Motions of Defendants P & S, Holyland, and Egan to Dismiss the Rico Claims). Because the RICO Case Statement is more recently filed, I therefore resolve any discrepancies between the Amended Complaint and the RICO Case Statement in favor of the RICO Case Statement.

Essentially, U.S. Fire claims that the Defendants engaged in the scheme detailed above to defraud them through an enterprise-in-fact consisting of all of the Defendants. Plaintiff alleges that the scheme was put in place to obtain insurance from U.S. Fire improperly—insurance Plaintiff did not intend to offer at otherwise inapplicably low premiums—and to profit from these transactions by improperly obtaining additional premiums from drivers and owners of the vehicles. In addition, P & S purported to bind insurance for U.S. Fire without U.S. Fire's knowledge or approval, creating false documents to do so and keeping all "premiums" for themselves.

In furtherance of their alleged scheme and conduct of the enterprise, P & S, with the knowledge and support of all Defendants, allegedly sent false and fraudulent documents to U.S. Fire via interstate wire and mail, and communicated via interstate telephone lines on numerous other occasions. Included among these documents were the January 21, 1999 Letter, the March 1999 Communication, over 100 separate commercial policy change request forms sent by fax, on behalf of ULS, seeking to add vehicles to the policy, the July 17, 2001 Fax, the July 20, 2001 Fax, copies of minutes of the board of directors' meetings of the Livery Defendants, documents relating to Vehicle Identification Numbers and documents purporting to evidence U.S. Fire insurance which were issued to other livery drivers.

Plaintiff alleges that the insurance scheme resulted in $2.7 million in lost premiums and $1 million in false claims.

## DISCUSSION

### I. Standard on a Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The Court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "In analyzing the issues on this motion to dismiss, [the Court] must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court." *McLaughlin v. Anderson*, 962 F.2d 187, 189 (2d Cir.1992). The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash,* 976 F.2d 86, 87 (2d Cir.1992) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

■ Where, on a Rule 12(b)(6) motion, a party seeks to introduce material extrinsic to the pleadings, "the district court must either exclude the additional material and decide the motion on the pleadings alone or convert the motion to one for summary judgment and afford all parties the opportunity to present supporting material." *Allen v. New World Coffee, Inc.*, No. 00 Civ 2610 AGS, 2001 WL 293683, at *2 (S.D.N.Y. March 27, 2001) ("*Allen I*") (citing *Morelli v. Cedel*, 141 F.3d 39, 46 (2d Cir.1998)). In this case, Plaintiff has included affirmations in support of its submissions on the instant motion. *See* (Affirmation of Stephen F. Willig and Ted Armas in Opposition to Defendants' Motion to Dismiss dated September 23, 2002.). I choose not to convert the motion into one for summary judgment, and so I decline to consider the affirmations.

## II. Moving Defendants' Motion to Dismiss is Granted in Part and Denied in Part

■■ Courts evaluating RICO claims must attempt to be "consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime." *United States v. Porcelli,* 865 F.2d 1352, 1362 (2d Cir.1989). "Because the 'mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.' " *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998). In order to ensure that "RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering ... courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *Id.*

Here, Plaintiff asserts four separate causes of action under RICO pursuant to 18 U.S.C. §§ 1962(a), (b), (c), and (d). Moving Defendants make various arguments seeking dismissal of each of these claims. First, Moving Defendants contend that all four claims must be dismissed because Plaintiff has failed to plead the predicate acts of mail and wire fraud with particularity as required by Fed.R.Civ.P. 9(b). Second, Moving Defendants assert that: (i) the Section 1962(a) claim should be dismissed because Plaintiff has not alleged injury as the result of investment of racketeering income; (ii) the Section 1962(b) claim should be dismissed for failure to allege acquisition or maintenance of an interest in an enterprise through a pattern of racketeering activity; (iii) the Section 1962(c) claim should be dismissed for failure to allege a RICO enterprise separate and distinct from the persons comprising the enterprise; and (iv) the Section 1962(d) claim must be dismissed because Plaintiff has not alleged any actionable RICO violation or facts sufficient to demonstrate a conspiracy.

### A. Failure to Plead with Particularity

■ To sustain a RICO claim, a plaintiff must show that defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 in "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Section 1961(1) defines "racketeering activity" and sets forth an exhaustive list of predicate offenses, including, most notably, 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). Plaintiff alleges that the various above-described transmissions by Defendants to Plaintiff of false and fraudulent documents constitute violations of §§ 1341 and 1343, and establish a pattern of "racketeering activities," as defined by 18 U.S.C. § 1961(1). Because these allegations are predicated on mail and wire fraud, this Court, in its RICO Case Standing Order, decreed that "the circumstances of fraud or mistake shall be stated in particularity" as specified by Rule 9(b). Standing Order, February 13, 2002, p. 1.

■■ Rule 9(b) requires that a complaint (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker, (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (citing *Cos-*

*mas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989)); *Ouaknine v. MacFarlane,* 897 F.2d 75, 79–80 (2d Cir.1990). While knowledge of defendant's fraud or intent to defraud may be averred generally under Rule 9(b), such allegations of scienter must be supported by facts "giving rise to a strong inference that the defendant knew the statements to be false and intended to defraud the plaintiff" at the time they were made. *Ouaknine,* 897 F.2d at 79–80. One means of alleging scienter is to show "clear opportunity and strong financial motive" for committing fraud. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 92 (2nd Cir. 2000). In addition, "where multiple defendants are accused of mail or wire fraud, plaintiffs must plead with particularity as to each defendant," *Allen I,* 2001 WL 293683, at *4 (citing *Mills,* 12 F.3d at 1176), unless such defendants are corporate insiders. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

I find that Plaintiff's Amended Complaint sufficiently alleges mail and wire fraud as to Defendants P & S and Egan, but not as to Holyland and Ziad.

### 1. Fraud Pleadings as to P & S and Egan

■ Plaintiff's RICO Case Statement asserts

The circumstances of wire fraud are as more specifically set forth in the amended complaint at paragraphs 4, 8, 44, 45, 50, 51, 59, 65 and 73. As alleged therein, there were well over 100 instances of wire fraud comprised of documents which were fraudulently prepared

with incorrect and purposely misleading information, including policy change request forms, corporate board minutes and other documents all telefaxed to plaintiff's office in Boston, Massachusetts, from P & S in Connecticut.

(Case Statement at ¶ 4(b)). In those paragraphs, Defendant identifies with specificity numerous documents allegedly containing fraudulent misrepresentations in support of the enterprise—the January 21, 1999 Letter; the March 1999 Communication; the July 17, 2001 Fax and accompanying corporate board minutes; the July 20, 1999 Fax; and the policy change request forms.

These documents more than adequately satisfy the pleading rules insofar as P & S, which sent them, is concerned. Contrary to Defendants' contention, the 1999 communications are not mere puffery. The first portion of the January 21, 1999 Letter refers to P & S's prior screening of limousine operators, and the March 1999 Communication refers to P & S's past and future avoidance of non-garaged limousines. They were statements of existing fact as of the time ULS issued the policies, and can serve as the basis for a fraud claim. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir. 1980) ("Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.").[3]

Further, Plaintiff has pleaded scienter by alleging sufficient facts as to P & S's motive to commit fraud. Specifically,

---

**3.** By contrast, Plaintiff's allegations regarding the Vehicle Identification Numbers (Amend. Compl. at ¶ 51), and the "false and fraudulent documents evidencing alleged insurance coverage" (Amend. Compl. at ¶ 53), do not survive under Rule 9(b) because the Amended Complaint and RICO Statement make no reference to when these representations were made, other than to say they occurred sometime between 1999 through mid–2001. (RICO Case Statement at ¶ 2(b)).

Plaintiff has alleged facts which suggest that P & S's (and Holyland's) motive was to obtain commissions and other compensation in the form of pocketed excessive premiums for the insurance (Amend. Compl. ¶¶ 52–53, Case Statement at ¶ 8).

As to Egan, the Amended Complaint makes no distinction between natural persons and corporations. For example, "ULS" is used to refer both to United Limousine Service and Kemial Kastrat; "Holyland" is used to refer to both Holyland and Ziad; and "DDI" is used to refer to both Douglas David Insurance and Douglas David. (Amend. Compl. at ¶¶ 10–11, 14–17.) Generally, this type of "group pleading" is not permitted under Rule 9(b). *See Devaney v. Chester*, 813 F.2d 566, 568–69 (2d Cir.1987) (upholding dismissal of complaint where plaintiffs made allegations as to the knowledge of the defendant corporation as a whole but failed to specify which persons at the defendant corporation had knowledge of false and misleading information). As to Egan, however, Plaintiff satisfies the particularity requirement because, in the RICO Case Statement, Egan is alleged to be a corporate insider. *DiVittorio*, 822 F.2d at 1247.

### 2. Fraud Pleadings as to Holyland and Ziad

■ Plaintiff's pleadings as to Defendants Holyland and Ziad, however, are lacking insofar as they fail to allege that either Defendant Holyland or Ziad committed any predicate acts of mail or wire fraud. The RICO Case Statement alleges that Holyland and Ziad "submitted documents that falsely represented that vehicles for which insurance was secured from plaintiff were owned and controlled by ULS . . ." (Case Statement at ¶ 2(c)). Yet, none of the communications alleged to have been received by U.S. Fire and referred to in the Amended Complaint is

alleged to have come from or to have contained representations from or concerning Ziad or Holyland. (Amend. Compl. at ¶¶ 39, 41–44, 50). In addition, as noted above, Plaintiff does not ·allege when the documents related to "fictitious sales" and "Vehicle Identification Numbers" were sent to Plaintiff. Thus, the mail and wire fraud claims against Defendants Holyland and Ziad are dismissed pursuant to Rule 9(b).

### B. Plaintiff is Granted Leave to Replead Predicate Acts as to Holyland and Ziad

■ Plaintiff has requested leave to amend should the Court issue an order of dismissal. Although I find the allegations in the Amended Complaint as to predicate acts committed by Holyland and Ziad have not been pleaded with particularity, Plaintiff represents to the Court that, as a result of its ongoing investigation into the allegations in the Amended Complaint, "additional facts will be available to amplify the pleading if necessary." (Pl. Sanctions Mem. at p. 35). In support of this claim, Plaintiff attaches to its papers an Affidavit from Ted Armas, the special investigator assigned to investigate the insurance claims made under the insurance policy issued by U.S. Fire to ULS. (Armas Aff. at ¶ 1). While I do not rely on any materials outside the pleadings in resolving Defendant's 12(b)(6) motion, I consider such materials here for the sole purpose of determining whether to grant Plaintiff leave to amend its Amended Complaint as to Defendants Holyland and Ziad. *John Gil Const., Inc. v. Riverso*, 99 F.Supp.2d 345, 353 n. 16 (S.D.N.Y.2000) (reviewing affidavit on a 12(b)(6) motion in considering whether to grant plaintiff leave to amend); *Vicioso v. Pisa Bros., Inc.*, 1998 WL 355415, at *5 (S.D.N.Y. July 1, 1998).

In his Affidavit, Armas claims that his investigation "showed that Holyland insurance [and] Abdul Ziad . . . have produced forged documents in order to deceive and mislead [Plaintiff] into affording coverage." (Armas Aff. at ¶ 13). However, this statement is conclusory and does not by itself show that Holyland or Ziad committed the predicate acts of mail or wire fraud. I cannot say that Plaintiff "could not, under any circumstances, sufficiently allege such claims." *Allen I*, 2001 WL 293683, at *10. I therefore grant Plaintiff leave to amend its pleading one more time to cure the Rule 9(b) violation as to Holyland and Ziad pursuant within 21 days from the date of this Order. *See* Fed.R.Civ.P. 15(a) (proving that "leave [to amend a pleading] shall be freely given when justice so requires"); *see also Cortec v. Sum Holding*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

I further caution Plaintiff that "An amended complaint which fails to replead with sufficient particularity after a finding of lack of specificity may well be regarded by the Court as a frivolous filing" in violation of Rule 11. *Protter v. Nathan's Famous Sys., Inc.*, 904 F.Supp. 101, 111 (E.D.N.Y.1995). I emphasize that this is a last chance opportunity.

## C. Failure to Allege a Substantive RICO Violation

Moving Defendants also maintain that Plaintiff's complaint fails to plead that any of the Moving Defendants violated the substantive aspects of RICO. Insofar as Plaintiff asserts claims under § 1962(a) and (b), I agree.

The substantive RICO statute prohibits a person from: (a) using or investing income "derived . . . from a pattern of racketeering activity," or any part of such income, "in acquisition of any interest in, or the establishment or operation of, any enterprise" engaged in or affecting interstate commerce; (b) acquiring any interest in or control of such an enterprise "through a pattern of racketeering activity"; (c) conducting or participating in "the conduct of such enterprises's affairs through a pattern of racketeering activity" if that person is "employed by or associated with" the enterprise; and (d) conspiring to violate any of subsections (a) through (c). 18 U.S.C. § 1962.

To succeed on a § 1962 claim, a plaintiff must first "independently allege both an enterprise—a group of persons in an ongoing association—and a pattern of racketeering activity—a series of allegedly criminal acts." *DeFalco v. Dirie*, 923 F.Supp. 473, 476 (S.D.N.Y.1996) (quoting *Procter & Gamble v. Big Apple Industrial Buildings, Inc.*, 879 F.2d 10, 15 (2d Cir. 1989)). The Amended Complaint meets both of these basic standards.

### 1. An Enterprise

An enterprise is defined as "an entity, . . . a group of persons associated together for the common purpose of engaging in a course of conduct." *De Falco v. Bernas*, 244 F.3d 286, 307 (2d Cir.2001) (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). The enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *Turkette*, the Supreme Court identified three primary characteristics of any RICO enterprise: first, an enterprise is "an ongoing organization, formal or informal . . ."; second, "the various associates [comprising an enterprise] function as a common unit . . ."; finally, the enterprise "is an entity separate and apart

from the activity in which it engages"i.e. it must be "separate and apart from" the pattern of racketeering. *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.

 "Courts in the Second Circuit must look at the 'hierarchy, organization and activities of an organization-in-fact to determine whether its members function as a unit'" *New York State Automobile Ins. Plan v. All Purpose Agency & Brokerage, Inc.*, 1998 WL 695869, at *5 (S.D.N.Y. Oct. 6, 1998) (quoting *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir.1991), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992)). For an association of individuals to constitute an enterprise, the individuals must "share a common purpose to engage in a fraudulent course of conduct and work together to achieve such purposes." *New York State Auto. Ins. Plan*, 1998 WL 695869, at *5 (citations omitted).

Moving Defendants argue that no enterprise exists because Plaintiff has failed to allege (1) that there was a common purpose among the Defendants or (2) that the enterprise had an existence apart from the pattern of racketeering activity. Moving Defendants are incorrect.

In support of their claim that there was no common purpose, Moving Defendants cite to *New York Auto. Ins. Plan*. In that case, the court found no common purpose where individual defendants submitted fraudulent insurance applications to a broker, forming a classic hub-and-spoke conspiracy. *Id.* Unlike the complaint in *New York Auto. Ins. Plan*, however, Plaintiff's

Amended Complaint alleges that the Defendants shared a common purpose, which was to "obtain insurance which was not otherwise available at favorable premiums." (Case Statement at ¶ 6; Amend. Compl. at ¶ 3).[4] Whether Plaintiff would *ultimately* be able to demonstrate a common cause amongst all the Defendants is questionable—but is not an issue for now.

Defendants' argument that the alleged enterprise had no independent existence is equally unpersuasive. There are two lines of authority among district courts on the question of whether an enterprise can exist if it has no ascertainable structure distinct from the alleged pattern of racketeering activities. *Compare Goldfine v. Sichenzia*, 118 F.Supp.2d 392, 394–95 (S.D.N.Y.2000) (1962(c) RICO claim dismissed where plaintiffs failed to allege "an ascertainable structure distinct from that inherent in [the alleged] pattern of racketeering," and where it was "apparent that the alleged enterprise, including the proposed defendants, would not still exist were the predicate acts removed from the equation"); *Heffernan v. HSBC Bank USA*, No. 99 Civ. 07981, 2001 WL 803719, *5 (E.D.N.Y. March 29, 2001); *Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 349–50 (S.D.N.Y.1998); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 580 (S.D.N.Y. 1999); *with Feinberg v. Katz*, NO. 99 Civ. 45(CSH), 2002 WL 1751135, at *12 (S.D.N.Y. July 26, 2002) (finding enterprise allegation sufficient where the complaint alleges a group without centralized hierarchy formed for the sole purpose of

4. It also should be noted that *New York Auto. Ins. Plan* was decided on a summary judgment motion, where the evidence presented clearly showed that "Clearly, the [Defendant] Insureds did not join together as a group to perpetrate the frauds against the Plaintiffs." *New York State Auto. Ins. Plan*, 1998 WL 695869, at *6 (citations omitted). The affidavits submitted by Plaintiff along with their papers raise some serious doubts in my mind as to whether Plaintiff's can prove the involvement of at least some of the Defendants in the alleged "enterprise." However, as I am considering this motion as one for dismissal, not summary judgment, I am constrained to dispose of it on the basis of the pleadings alone.

carrying out a pattern of racketeering acts (citing an unpublished Second Circuit opinion, *Pavlov v. Bank of New York Co., Inc.,* 25 Fed. Appx. 70 (2d Cir.2002))).

Under either standard, the Amended Complaint here is adequate. First, Plaintiff alleges that the enterprise is structured, with "P & S at the top" and "Defendants MISV, D.E.F., Jenny, Z & Z, TRIPLE A, MLM, R & R, RMP, ABC, N.Y. Luxury, C & M and LM" comprising the "lower structure." (Case Statement at ¶ 5b). The Amended Complaint also alleges that the enterprise was engaged in conduct other than the predicate fraudulent acts committed against U.S. Fire. For example, it alleges that the enterprise was illegally selling insurance under the name of U.S. Fire without U.S. Fire's knowledge or approval (Amend.Compl.¶¶ 52, 53). Thus, the Plaintiff has sufficiently pleaded an enterprise.

### 2. *Pattern of Racketeering Activity*

The Amended Complaint also pleads the pattern of racketeering activity necessary to survive Moving Defendant's motion to dismiss on this ground. A plaintiff seeking to demonstrate a pattern of racketeering activity under § 1962 must allege (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that the predicate acts are related to each other; and (3) that the predicate acts amount to or pose a threat of continued criminal activity. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2nd Cir.1999) (quoting *H.J. Inc. v. Northwestern Bell,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). Moving Defendants challenge only the "continuity," not the "relatedness," of the predicate act allegations.

A plaintiff may satisfy the continuity requirement by alleging either a close-ended pattern—that is, criminal conduct extending over a substantial period of time—or an open-ended pattern, i.e., past criminal conduct coupled with a threat of future criminal activity. *Cofacredit, S.A.,* 187 at 242. Since the Supreme Court outlined these standard in *H.J. Inc.,* "the Second Circuit has never held a period of less than two years to constitute a 'substantial period of time' for purposes of closed end continuity." *Oak Beverages, Inc. v. Tomra of Massachusetts, L.L.C.,* 96 F.Supp.2d 336, 347 (S.D.N.Y.2000).

Here, U.S. Fire has alleged as the initial predicate act, the March 1999 Communication, and, as the last specified predicate act, the July 20, 2001 Fax—spanning a period of over two years. I find that this is a substantial period of time for purposes of satisfying the closed-end continuity requirement.

Although the Amended Complaint meets the minimum standards for pleading "enterprise" and "a pattern of racketeering activity," it fails to establish other fundamental elements of a substantive RICO claim on two of the four statutory theories.

### 3. *Section 1962(a)*

Plaintiff's Amended Complaint is deficient because it fails to allege an "injury" that resulted from Defendants' investment of racketeering income. For an injury to be compensable under § 1962(a), it must have been caused "by reason of" a defendant's investment of racketeering income in the enterprise. *Ouaknine,* 897 F.2d at 82–83.

Accordingly, a claim under § 1962(a) has two elements: (1) that the defendant received income from a pattern of racketeering activity; and (2) that the plaintiff was directly harmed by the defendant's use or investment of that income. Claims under Section 1962(a) alleging inju-

ry resulting from racketeering activity alone, rather than from the investment of income so derived, are subject to dismissal. *Id.,* at 82.

■ Conclusory allegations that the defendant "used or invested" the income derived from racketeering in its operations are insufficient. *See Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 657 (S.D.N.Y.1996), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (Plaintiffs "completely failed to allege any injury caused by the use or investment of alleged racketeering income ..." "Plaintiffs' conclusory allegation that Defendants 'used or invested' income received ... is insufficient because it fails to allege how that use or investment injured them").

■ Nor does it suffice to allege that the Defendants' reinvestment of proceeds received from fraudulent activity helped the enterprise to continue its operations, thereby causing the plaintiff harm. "Courts have repeatedly held that the injury causation requirement of § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the income in its general operations, thereby permitting it to continue its pattern of racketeering and cause further injury." *Katzman,* 167 F.R.D. at 657.

In this instance, the Amended Complaint alleges only that

This income received by defendants through operation of the vehicles and collection of premium, was invested in the enterprise which consisted of each of the defendants. They utilized the money to continue their operations either as livery cab operators or as quasi or actual insurance brokers to insure others in the industry. The monies received were also used to solicit additional potential 'insureds' and to keep the operation going. The income paid for the overhead of the entities, salaries of the defendants and other costs.

(Case Statement at ¶ 8(b).) Plaintiff contends that these allegations suffice to show injury by reason of investment of racketeering income because the "moving defendants" received "commissions and hidden excessive premiums" which they "invested into the enterprise, thus enabling the enterprise to be created and then to flourish at the great expense of U.S. Fire." (Pl. Mem. at 23).

This is simply not the case. Courts in this District have consistently held that "As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under RICO." *Allen v. New World Coffee, Inc.,* 2002 WL 432685, at *4 (S.D.N.Y. March 19, 2002) ("*Allen II* "). *See also Soberman v. Groff Studios Corp.,* 1999 WL 349989 *5 (S.D.N.Y. June 1, 1999) ("[A]llegations that the money was used or invested to further the same scheme are insufficient, since they do not allege a distinct injury."); *Mehrkar v. Schulmann,* 2001 WL 79901, at *5 (S.D.N.Y. Jan.30, 2001) (same). *Accord Protter v. Nathan's Famous Systems, Inc.,* 925 F.Supp. 947, 954 (E.D.N.Y.1996) ("Th[e] investment-injury requirement is not satisfied merely because the defendant/enterprise has reinvested the money from the racketeering acts back into its own operations, thus enabling the scheme to continue ... [P]laintiff must show that *it* was injured by the investment itself.") (emphasis added).

Here, Plaintiff's alleged injury consists of providing insurance at rates less than the rates it could have charged if it had known the truth (assuming it would have offered these owners any coverage at all). This injury did not result from the investment of the racketeering proceeds (i.e. the commissions and hidden excessive premiums), but rather flowed directly from the

predicate fraudulent acts. Because U.S. Fire has failed to properly allege any injury caused by the alleged enterprise's investment of racketeering income, its § 1962(a) claim must be dismissed as to all Moving Defendants.

### 4. Section 1962(b)

 To state a claim under Section 1962(b), the plaintiff must allege "an acquisition or maintenance injury" separate and apart from the injury suffered as a result of the predicate acts of racketeering. *Katzman,* 167 F.R.D. at 657 (citing *Official Publications v. Kable News Co.,* 775 F.Supp. 631, 635 (S.D.N.Y.1991)); *see also Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ. 5191(JFK), 1997 WL 603496, at *3 (S.D.N.Y. Sept.30, 1997) (the injury must be caused by "acquisition of an interest in an enterprise, *as distinct from an injury resulting from the pattern of racketeering activity, or the commission of predicate acts.*") (emphasis added). Failure to allege such an injury results in dismissal. *Katzman,* 167 F.R.D. at 657.

Plaintiff's Section § 1962(b) claims are deficient for the same reason as its § 1962(a) claims are—failure to allege injury separate from that resulting from the predicate acts. The Amended Complaint makes the conclusory allegation that "plaintiff has been injured in its business and property by the defendants' establishment and maintenance of interest in and control over the RICO enterprise." (Amend. Compl. at ¶ 66). However, as the remainder of that paragraph makes clear, the alleged injury was caused by the alleged predicate acts, not by the acquisition or maintenance of any interest in the enterprise: "That injury includes premium which it was entitled to collect given the true nature of the risk and/or the claims which it has had to pay on risks it never

agreed to assume and would not have assumed given all the facts." (*Id.*)

Plaintiff's RICO Case Statement does nothing to cure this deficiency. Paragraph 9 alleges that

> With regard to the § 1962(b) violations, the income obtained by the defendants allowed them to acquire and maintain their position within the enterprise. Without the ability to collect income and share that income with the other defendants, any of the individual defendants, or entity defendants, would not have been so included in the enterprise, as the derivation of illicit income by operation of vehicles for hire and collection of illicit income was the goal of the enterprise.

(Case Statement at ¶ 9.) Similarly, paragraph 12 of the RICO Case Statement merely recites that "Plaintiff's property or business has been injured because it has had to pay out over $1.7 million in claims and related expenses incurred thus far on actions involving vehicles which would not otherwise have been insured had they [sic] known the true information about those vehicles," and that "plaintiff has suffered damages of at least $2.7 million in premiums which it would have been entitled to charge these vehicles for insurance given the true risks involved." None of these allegations shows an injury to Plaintiff directly resulting from Defendants acquisition of interest in the purported enterprise.

The purpose of § 1962(b) is "to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Allen II,* 2002 WL 432685, at *5 (quoting *Pyke v. Laughing,* No. 92-CV-555, 1998 WL 37599, at *1 (N.D.N.Y. Jan. 26, 1998) (quoting *Mark v. J.I. Racing, Inc.,* No. 92-CV-5285, 1997 WL 403179, at *3 (E.D.N.Y. July 9, 1997))). Because Plaintiff has alleged no

facts to suggest a separate acquisition injury, the purposes of § 1962(b) are not furthered by the allegations contained in Plaintiff's Amended Complaint. Plaintiff's § 1962(b) claims are therefore dismissed as to all Moving Defendants.

### 5. Section 1962(c)

■ Section 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...

18 U.S.C. § 1962(c). The four elements of Section 1962(c) are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir.2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 242 (2d Cir.1999)). The elements of section 1962(c) must be established as to each individual defendant. *DeFalco,* 244 F.3d at 306 (citing *United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).")).

■ Having already addressed the "enterprise" and "pattern of racketeering" prongs, I now focus on the "conduct" element. To "*conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs*" requires "participation in the operation or management of the enterprise." *DeFalco,* 244 F.3d at 309. In *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court elaborated on the meaning of the terms "conduct" and "participate":

Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, [footnote omitted] but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

In this Circuit, the "operation and management" test is an extremely rigorous test. *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998) (quoting *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1090 (S.D.N.Y. 1996)). There is a "substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because the 'test is not involvement but control.'" *Shams v. Fisher,* 107 F.Supp.2d 266, 274–75 (S.D.N.Y.2000) (quoting *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 924 F.Supp. 449, 466 (S.D.N.Y.1996)). It is not enough to merely take directions and perform "tasks that are 'necessary and helpful' to the enterprise." *Schmidt,* 16 F.Supp.2d at 346 (quoting *United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994)). Nor is it enough to simply provide "goods and

services that ultimately benefit the enterprise." *Schmidt,* 16 F.Supp.2d at 346 (quoting *LaSalle,* 951 F.Supp. at 1090). The deciding issue, then, is "whether the provision of these services allows the defendant to direct the affairs of the enterprise." *Schmidt,* 16 F.Supp.2d at 346.

Accordingly, courts in the Second Circuit have dismissed claims against professional service providers asserted under § 1962(c) that failed to meet these standards. *See e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521–22 (2d Cir.1994) (dismissing RICO claim against attorneys on the ground that the provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 254 (S.D.N.Y.1997) ("The provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself"); *Industrial Bank of Latvia v. Baltic Financial Corp.,* 1994 WL 286162, at *3 (S.D.N.Y. June 24, 1994) (dismissing RICO claim against bank and individual officers on the ground that "providing banking services—even with knowledge of the fraud— is not enough to state a claim").

Plaintiff's contention that the Moving Defendants conducted or participated in the conduct of the alleged enterprise's affairs sufficiently to support the imposition of liability rests on the case *131 Main St. Assocs. v. Manko,* 897 F.Supp. 1507 (S.D.N.Y.1995). (Pl. Mem. at 32). According to Plaintiff, *Manko* stands for the proposition that "no defendants, P & S, ULS, and Holyland included, can escape liability by arguing that they only allowed their name to be used or their contract with U.S. Fire to be exploited. Even if that

were all they did, they share equal liability." (*Id.*).

In *Manko,* defendants Tese and Sinclair created an entity ("TSM") whose sole purpose was to act as the counterpart in $38 billion worth of fictitious and prearranged put option trades, Treasury Bill straddles and repurchase agreements with certain limited partnerships as part of a fraudulent tax shelter scheme. *Manko,* 897 F.Supp. at 1513, 1526. Tese and Sinclair "loaned" TSM to the other defendants, Manko and Edelman, "when they knew, or recklessly disregarded the fact, that Manko and Edelman would use TSM to create bogus tax losses" and "stood to profit from the 'loan' of their corporation to Manko and Edelman." *Id.* Judge Sand reasoned that:

> though Tese and Sinclair did not operate or manage the enterprise in the sense of involving themselves in the day-to-day processing of fraudulent trades and communications with investors and outside auditors, neither were they the sort of unwitting footsoldiers whose liability was at issue in *United States v. Viola,* 35 F.3d 37 (2d Cir.1994), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). They allegedly enabled the partnerships· to function effectively by providing their own company, TSM, as the partnerships' corporate trading partner. In so doing, they helped determine the enterprise's modus operandi, and can be said to have 'managed' its basic structure. Moreover, it is not unreasonable to assume that Tese and Sinclair exercised a degree of control over the enterprise as a whole because of TSM's centrality to the scheme.

*Id.* at 1527–28. Judge Sand's decision in *Manko* rested, in turn, on *Azrielli v. Cohen Law Offices,* 21 F.3d 512 (2d Cir.1994), in which the Second Circuit "upheld a § 1962(c) claim against a defendant whose

only alleged participation in a real estate tax shelter was that of allowing his name to be used on a bogus contract and showing up at the closing of the fraudulent property sale." *Manko,* 897 F.Supp. at 1528.

Moving Defendants ask this Court to hold that *Manko* and *Azrielli* "have no application to an outside purveyor of services, such as P & S [or Holyland], that merely accepted applications as part of its routine and legitimate business operations and forwarded them to U.S. Fire." (Reply Mem. at 8). Were this all that Plaintiff had alleged, then Moving Defendants would undoubtedly be right, and I would so hold. However, Defendants P & S and Holyland's status as "outside purveyors of services" does not automatically shield them from liability as a matter of law. *See Hottinger v. Amcoal Energy Corp.,* 89 Civ. 6391(LMM), 1994 WL 652499, at *2 (S.D.N.Y. Nov. 17, 1994) (refusing to dismiss a 1962(c) claim against a lawyer as a matter if law because "Whether she participated in the conduct of the racketeering enterprise depends not ... on her status as a lawyer but on her actual conduct.... The failure to describe that role with further specificity in the pleadings does not render them inadequate." (quoting *Friedman v. Hartmann,* 1994 WL 97104, at *4 (S.D.N.Y. March 23, 1994))).

▮ Based on my review of the Amended Complaint, it appears Plaintiff has sufficiently alleged that Defendants P & S and Holyland "participated" in the alleged enterprise by doing more than providing services as part of its routine and legitimate business operations. Indeed, the pleadings allege that they were key participants, by making critical misrepresentations, creating false documents and, in P & S's case, serving as the point of communication. (*See* Amend. Compl. at ¶ 70 ("Defendants ULS, P & S, Holyland

and DDI participated in, conducted and controlled the operation or management of the enterprise by fraudulently misrepresenting to U.S. Fire the true ownership and operation of the vehicles ..."); *Id.* at ¶ 72 ("defendants P & S, Holyland and DDI, upon information and belief, created false documents"); *Id.* at ¶ 73(a) ("P & S prepared and issued false and fraudulent requests to insure ULS and then to add vehicles to the policy"); Case Statement at ¶ 2c ("Holyland was aware of and assisted ULS and P & S in issuing false insurance applications to plaintiff"); Rico Case Statement at ¶ 5b ("the enterprise was structured with P & S at the top as the point of communication with plaintiff. Both Holyland and DDI solicited business from the livery cab industry and funneled the business through P & S.")).

Defendants' motion to dismiss the § 1962(c) claim is therefore denied as to P & S. Because I have already dismissed Plaintiff's claims against Holyland and Ziad for the underlying predicate acts of mail and wire fraud, however, I also dismiss the § 1962(c) claim as against them, without prejudice.

### 6. *Section 1962(d)*

▮ Section 1962(d) makes it unlawful to conspire to violate the previous three sections. In order to allege a conspiracy under § 1962(d), the plaintiff must assert that "each defendant by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise." *Allen I,* 2001 WL 293683, at *8 (quoting *Colony at Holbrook, Inc. v. Strata, Inc.,* 928 F.Supp. 1224, 1238 (E.D.N.Y. 1996)); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 244 (2d Cir.1999). Conclusory allegations that "all of the defendants conspired among themselves to further the scheme

454

to defraud" and "knowingly and willingly participated in the conspiracy" are insufficient. *Adler v. Berg Harmon Assocs.*, 790 F.Supp. 1222, (S.D.N.Y.1992); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *30 (S.D.N.Y. Mar. 15, 1994) ("[N]umerous district courts within this circuit have dismissed conclusory allegations of agreement as insufficient to state a RICO conspiracy claim.") (citations omitted); *Com–Tech Associates v. Computer Associates International, Inc.*, 753 F.Supp. 1078, 1092 (E.D.N.Y.1990) (dismissing conspiracy count because plaintiff failed to allege facts establishing that each of the defendants, by words or actions, manifested an agreement to commit two or more predicate acts).

■ Here, Plaintiff alleges that

By engaging in the overt acts and other conduct described above, defendants have agreed to conspire, and did so conspire, in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §§ 1962(a)-(c).

(Amend. Compl. at ¶ 78). Plaintiff's RICO Case Statement adds that

With regard to the violation of 18 U.S.C. § 1962(d), the conspiracy consisted of the defendants purposely and knowingly discussing and implementing a plan whereby they would obtain insurance which was not otherwise available to them at rates otherwise not available so that they could derive income for their benefit. They plotted to create false and fraudulent documents, solicited others and utilized the interstate wires to further their scheme and plan.

(Case Statement, at ¶ 11). These conclusory statements are buttressed by the more specific allegations detailed above.

Considered as a whole, these allegations "provide[ ] a substantial factual basis from which to infer an agreement among these defendants." *Madanes v. Madanes*, 981 F.Supp. 241, 258 (S.D.N.Y. Oct. 8, 1997); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir.1990) (noting that Rule 9(b) applies only to fraud or mistake, not conspiracy, and thus pleading of conspiracy, apart from underlying acts of fraud, is properly measured under more liberal pleading requirements of Rule 8(a)). The fact that numerous other corporations have not appeared in this action is irrelevant.

Thus, Defendants' motion to dismiss the § 1962(d) claim is denied as to P & S. The § 1962(d) claim is dismissed without prejudice as to Holyland and Ziad because the predicate acts were not pleaded with particularity. *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F.Supp.2d 282, 303 (S.D.N.Y.2000).

### D. Plaintiff is Granted Leave to Replead Substantive RICO claims §§ 1962(c) and (d) as to Holyland and Ziad

■ I decline to grant leave to amend as to Plaintiff's 1962(a) and (b) claims. Plaintiff has already amended its complaint once and in addition has filed a RICO Case Statement. The facts alleged in those documents convince me that the injuries allegedly suffered by Plaintiff here all stem from the same predicate acts, not from the investment of income in or the acquisition of an interest in the enterprise. I therefore do not believe that Plaintiff could ever replead §§ 1962(a) or (b) as to any of the Defendants, and dismiss those claims with prejudice as to all Moving Defendants.

Plaintiff is granted leave to replead §§ 1962(c) and (d) as to Holyland and Ziad, but I again remind Plaintiff that

there will be no further opportunities to amend the complaint. If the fraud allegations remain sufficiently non-specific, the RICO claims will be dismissed. The amended pleading must refer to *specific* statements or actions, made on *specific* dates by specific *persons.*

## III. Rule 11

The Moving Defendants have moved for sanctions based on Plaintiff's RICO claims. In particular, Moving Defendants argue that (1) Plaintiff's Counsel's failure to plead with particularity under 9(b) merits sanctions and Plaintiff's Counsel's allegations under §§ 1962(a), (b) and (d) were sanctionably deficient under Rule 11(b)(2) and (2) that Plaintiff's Counsel's allegation that Defendant Egan was an officer of P & S violated Rule 11(b)(3). The motion is denied.

 A district court will impose sanctions under Rule 11 only if it is "patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands ..." *Eastway Constr. Copr. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985); *see also O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706 (2d Cir.1990) ("[I]f it is clear that the action was destined to fail based on the fact and the existing precedent, and were no reasonable argument could be advanced to change or extend the present law, rule 11 requires a sanction."). Rule 11 sanctions are an extreme remedy, such that "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable ... district courts [must] resolve all doubts in favor of the signer." *Associated Indem. Corp. v. Fairchild Indus.,* 961 F.2d 32, 34–35 (2d Cir.1992) (emphasis in origi-

nal) (citations and internal quotations omitted).

 Having reviewed the Plaintiff's papers in their entirety, I find that the Plaintiff's claims are not sanctionable under Rule 11(b)(2). First, Plaintiff's pleadings are not in and of themselves sanctionable. *See e.g. Patrick Carter Assocs., Inc. v. Rent Stabilization Ass'n of N.Y.C., Inc.,* 1990 WL 195993, (S.D.N.Y. Nov. 28, 1990) (citing *Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 670 (2d Cir.1989)) ("The failure to plead RICO allegations in conformity with Rule 9(b) cannot form the basis for sanctions."). Nor can I say with confidence that Plaintiff's substantive arguments were "destined to fail" based on existing precedent. *G–I Holdings, Inc. v. Baron & Budd,* No. 01 Civ. 0216 RWS, 2002 WL 1934004, at *16 (S.D.N.Y. Aug. 21, 2002). Somewhat more troubling is Plaintiff's Counsel's apparently false allegation that Defendant Egan was an officer of P & S.

• As amended in 1993, Rule 11(b)(3) "allows the imposition of sanctions upon a finding that a factual allegation has no evidentiary support, unless there was a specific disclaimer that additional investigation was necessary." *O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir.1996). In determining the applicability of sanctions under 11(b)(3), I must assess whether counsel for the Plaintiff has conducted "an inquiry reasonable under the circumstances" into whether his "factual contentions have evidentiary support." Fed. R.Civ.P. 11(b) & (b)(3); *see also Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1330 (2nd Cir.1995). A court may consider a variety of factors, including whether the attorney relied on the client for factual information, whether the pleading was supported by a plausible view of the law, or even how much time was spent on research. *O'Malley,* 896 F.2d at 706.

P & S's Counsel, Mr. Cerussi, claims that not only did Plaintiff's Counsel, Mr. Glazer, fail to conduct an inquiry, but that he was in fact twice advised by Mr. Cerussi that Defendant Egan was not an officer of P & S—once by telephone, on April 4, 2002, and once in writing, on April 22, 2002. (Def. Sanctions Mem. at p. 11–12).[5] Yet Plaintiff's Counsel filed a RICO Case Statement on April 15, 2002 repeating the allegation that Defendant Egan was an officer of P & S. Defendant's Counsel now argues that Plaintiff's Counsel's refusal to withdraw the allegations against Defendant Egan on this basis constitutes adequate grounds for sanctions.

The mere fact that Mr. Glazer ignored Mr. Cerussi's oral representation that Defendant Egan was not an officer of P & S is insufficient to warrant the imposition of sanctions in this case. Further, Defendant's Counsel seems to have based his belief that Egan was an officer on the fact that "Mr. Egan was clearly representing P & S and acting in its behalf" at the time Plaintiff filed its Amended Complaint. (Affidavit of Neal M. Glazer in Opposition to Motion for Sanctions Pursuant to F.R. Civ. P. 11 at ¶ 6). There is no reason for me to disbelieve Plaintiff's Counsel on this point, and Moving Defendants have presented me with no additional reasons to find Plaintiff's inquiry into the matter deficient.

Plaintiff's motion for Rule 11 sanctions is therefore denied.

## CONCLUSION

For the reasons discussed, I dismiss with prejudice Plaintiff's §§ 1962(a) and (b) claims against all moving Defendants;

and without prejudice Plaintiff's RICO claims against Defendants Holyland and Ziad pursuant to 9(b), §§ 1962(c) and (d).

Plaintiff has leave to amend the claims that were dismissed without prejudice within 14 days from the date of this Order. Defendants have 10 days thereafter to file any motion addressed to the amended pleading. Plaintiff's response, if any, is due 5 days from that date. The motions should be made in the form of letter briefs and should be no more than 5 pages in length.

Defendant's motion for sanctions is denied.

IT IS SO ORDERED.

---

5. Plaintiff has not violated Rule 11 if an alleged fact reasonably asserted at the time the Amended Complaint and RICO Case Statement were drafted is later contradicted or discredited by defendant's attorney. *See Oli-* *veri v. Thompson,* 803 F.2d 1265, 1275–1276 (2d Cir.1986) (Rule 11 applies only to the initial signing of a pleading and does not create a continuing duty upon the signing attorney to amend the pleadings).